1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    EASTERN DISTRICT OF WASHINGTON

7   In Re:

8   LLS AMERICA, LLC,                    NO:  CV-13-18-RMP

9                        Debtor,          Bankr. Case No. 09-06194-PCW11

10  BRUCE P. KRIEGMAN, solely in his      Adv. Proc. No. 11-80287-PCW11
    capacity as court-appointed Chapter 11
11  Trustee for LLS America, LLC,         FINDINGS OF FACT AND
                                          CONCLUSIONS OF LAW
12                       Plaintiff,

13  v.

14  HORST ROMANI, et al.,

15                       Defendants.

16

17          This consolidated action was tried before the Court from June 2 through

18  June 3, 2014.  Plaintiff, Bruce P. Kriegman, the court-appointed Chapter 11

19  Trustee for LLS America, LLC ("Trustee"), was represented by Thomas Cochran

20  of Witherspoon Kelley.  Defendants Horst and Claudine Romani appeared pro se.


FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

H & C Investments, Ltd. and the Estate of Rene and Armande Baudez were represented by Dillon Jackson of Foster Pepper.  Claudine Romani, the executor of the Estate of Rene and Armande Baudez, previously terminated Foster Pepper as counsel for the Estate.  ECF Nos. 44, 45.  However, at times during trial, Ms. Romani allowed Mr. Jackson to participate on the Estate's behalf.

The Court heard the testimony of the parties' witnesses and, having reviewed the admitted exhibits and being fully informed, makes the following findings of fact and conclusions of law:

## PREVIOUS RULINGS

### 1.    Ponzi Scheme and Insolvency

On July 1, 2013, the Bankruptcy Court issued its Report and Recommendation Re Plaintiff's Motion for Partial Summary Judgment on Common Issues ("Report and Recommendation"), recommending that the District Court grant the Trustee's Amended Motion for Partial Summary Judgment on two "Common Issues": (1) Debtor operated a Ponzi scheme; and (2) Debtor was insolvent at the time of its transfers to the defendants.  On August 19, 2013, this Court adopted the Bankruptcy Court's Report and Recommendation and entered an order granting the Trustee's Amended Motion for Partial Summary Judgment on the Common Issues ("Order Adopting Report and Recommendation").  *See* 2:11-cv-00357-RMP, ECF No. 92.  Therefore, this Court has determined that

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 2

Debtor operated a Ponzi scheme and was insolvent at the time of each of the transfers to Defendants.

All of the findings and conclusions set forth in the Report and Recommendation and the Order Adopting Report and Recommendation are incorporated by this reference and are the law of this case.

**2.    Omnibus Hearing for the Testimony of Charles Hall**

On January 31, 2014, the Court granted Plaintiff's Motion for Omnibus Hearing. ECF No. 26. Pursuant to that Order, the court-appointed examiner, Charles Hall, testified at an Omnibus Hearing in open court commencing on February 25, 2014. His testimony consists of written direct examination testimony that was filed on or about February 17, 2014, and the oral testimony that he gave at the Omnibus Hearing. Mr. Hall was cross examined by several defense attorneys, including those from Foster Pepper, and by some pro se defendants. Mr. Hall's testimony at the Omnibus Hearing became part of the record in this adversary action.

**FINDINGS OF FACT**

1.    Debtor is the Little Loan Shoppe group of companies, which originally was formed in 1997. PO-1 at 11.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 3

2.      Debtor operated a Ponzi scheme, whereby investors' loans were sometimes used to pay other investors' promised returns on investments.  PO-1 at 16.

3.      Over the course of its existence, Debtor acquired approximately $135.4 million from investments made by individual lenders and documented by means of promissory notes offering interest returns in the range of 40%-60% per annum.  PO-1 at 7 n.2, 15.

4.      Defendants made loans to Debtor.

5.      Defendants all received interest and principal payments from Debtor. Dozens of the payments that Defendants received were written on checks showing Debtor's Spokane address.  P-14; P-34.

6.      Defendants are "net winners."

7.      Debtor was never profitable at any time during its existence and thus, at no time did it generate sufficient profits to pay the amounts due the lenders. PO-1 at 16.

8.      Debtor accumulated payday loan bad debts of approximately $29 million, which were written off in 2009.  PO-1 at 41.

9.      Debtor gave lenders, including Defendants, post-dated checks to cover interest payments, but some checks had insufficient funds to cover payment of the checks.  PO-1 at 24-25; P-16 at 17-18; P-37 at 1-2.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4

10.    Debtor voided approximately 29,000 of the post-dated checks that it had issued to lenders, including Defendants.  PO-1 at 26; P-16 at 17-18; P-37 at 1-2.

11.    Some of the promissory notes that Defendants received from Debtor were executed in Washington State.  *See* P-25 at 2; P-26 at 2; P-27 at 4; P-31 at 12-17.

12.    The Baudezes received promissory notes that were rolled into or renewed into other promissory notes.  P-30 at 3; P-31 at 10, 12, 13, 16.

13.    There is no evidence that Defendants ever received any account statements or financial statements from Debtor.

14.    All of the transfers that the Trustee seeks to avoid were made within the period of September 1997 to July 21, 2009.  *See* P-10 at 28; P-30 at 17.

15.    Each of the Defendants filed proofs of claim in Debtor's Bankruptcy case.  P-21; P-22; P-23; P-24; P-25; P-26; P-31.

16.    Indicia and characteristics of the Ponzi scheme present in this case include:

a.    Proceeds received from new investors masked as profits from running a payday loan business; PO-1 at 16, 22;

b.    Promise of a high rate of return on the funds of between 40% to as much as 60%; PO-1 at 19;

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5

c.    Debtor paid commissions to third parties who solicited new lenders, typically 10% annually of the amount received from the new lender; PO-1 at 20, 21;

d.    Debtor solicited funds as loans evidenced by a promissory note but demonstrated a pattern of "rolling over" the promissory notes when due onto new notes instead of paying off the obligation; PO-1 at 26;

e.    Debtor, throughout its history, made false and misleading statements to current and potential lenders; PO-1 at 53-54;

f.    Debtor was insolvent from its inception to the filing of its bankruptcy; PO-1 at 67.

17.    The court-appointed examiner, Charles B. Hall, by way of education, experience, and vocation, is qualified to analyze and review the legitimacy of an enterprise's operation to detect a fraud based on Ponzi scheme operations.

18.    Mr. Hall, during the Omnibus Hearing, both in writing and in oral testimony described Mr. Hall's understanding of Horst Romani's role in Debtor's Ponzi scheme.  *See* PO-1 at 58-62.

19.    Mr. Hall's expert opinion is credible.

20.    Mr. Curtis Frye's testimony, which pertained to Debtor's record keeping and the accounting of investment, payments, and consulting fees/commissions to the Defendants, is credible.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 6

1    21.    Specific findings of fact for each Defendant are as follows:

2        **a. Horst and Claudine Romani**

3    The Romanis began investing in Debtor in 2000 and started receiving

4    interest payments.  P-12 at 1; P-10 at 7.  Like other investors, the Romanis

5    received promissory notes from Debtor offering interest returns of 40%-60% per

6    annum.  *See, e.g.*, P-21 at 2; P-23 at 3-4.  Mr. Romani also received finder's fees

7    or commissions for soliciting new investors for Debtor.  *See* PO-14 at 8, 14.

8    There is no evidence that the Romanis significantly researched Debtor before

9    investing, relying instead on the experience of their friend who had invested in

10    Debtor and on information that they received from Doris Nelson, Debtor's

11    proprietor.  P-28 at 12-13.  The Romanis testified that, although the interest rates

12    on the promissory notes were high, they compared the rates to high interest rates

13    for credit cards.  The Romanis also testified that the promissory notes' interest

14    rates seemed legitimate in light of the interest rates charged in Debtor's allegedly

15    lucrative business of payday lending.   At some point, the Romanis visited

16    Debtor's business in Spokane, Washington, coming away impressed.  P-28 at 13.

17    The Court finds credible the Romanis' testimony that, at least in the

18    beginning of their relationship with Debtor, they believed that they were among a

19    small group of contributors to Debtor and that Ms. Nelson continued to share her

20    success with them out of friendship.  The Court finds that, initially, the Romanis

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7

invested and received payments from Debtor under an objective standard of good faith. The Romanis' testimony regarding their early relationship with Debtor is credible and supports the Court's finding that they were unaware at that time of many of the red flags that would have alerted a reasonable person to the fraudulent nature of Debtor's scheme.

As their involvement with Debtor progressed, however, the Court finds that the Romanis became aware of facts that would have revealed the fraud to a reasonably prudent person.

The evidence shows that Mr. Romani learned of significant signs of Debtor's fraud through his efforts to find new investors. Contrary to Mr. Romani's testimony that he merely put potential investors in contact with Debtor, his emails show that he more actively solicited new investments. On December 15, 2007, for example, Mr. Romani explained to a potential investor the terms of investing in Debtor and revealed how much money he and his friends had invested. PO-14 at 20. Mr. Romani also reminded Debtor of the importance of his role in raising additional funds. *See* PO-14 at 22 (". . . I guess [Ms. Nelson] would like to thank me for the $ 1,000,000 bucks I got her over the last couple of weeks"); P-20 at 16 (". . . I have provided for you in total over 3 Million dollars, of which I feel very much personally responsible for. Believe me, I am always the first one to get the phone calls if you default or are late making payments.").

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

Further, on April 1, 2008, Mr. Romani informed Debtor that future investors would not receive 60% interest; "40% is plenty[.]  I rather take the difference as finders [sic] fee."  PO-14 at 23.  Mr. Romani suggested that Debtor should "[j]ust tell them the Law has changed and its [sic] not possible to pay 60%."  PO-14 at 23.  These emails show that Mr. Romani was aware of Debtor's suspicious business practices and that he even directed Debtor to deceive an investor so that he could receive a larger commission.

The regularly missed payments and other issues that investors raised should have alerted Mr. Romani and caused him at least to investigate Debtor more thoroughly.  Instead, when the British Columbia Securities Commission was investigating Debtor in October 2008, Mr. Romani told Ms. Nelson that he preferred to communicate using encrypted emails rather than through phone calls, which he suspected that the Commission could record.  PO-14 at 32.  Mr. Romani recounted in a later email to Ms. Nelson that during the Commission's investigation, "we [had] to lie for you through our teeth to keep you out of trouble."  P-20 at 17.  At some point while the Romanis were receiving payments from Debtor, Mr. Romani's need to "lie through our teeth" provided sufficient notice to Mr. Romani that would have warned a reasonable person that Debtor's business was fraudulent.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 9

The Court finds that the Romanis have established that they acted within the objective standard of good faith during the first years of their relationship with Debtor.  The record shows that as of April 1, 2008, however, Mr. Romani was aware of facts that should have alerted him to Debtor's fraud.  On that date, Mr. Romani instructed Debtor to misinform an investor that due to an apparently fictitious and arbitrarily chosen change in the law, the investor would receive a lower interest rate.  PO-14 at 23.  Mr. Romani should have been aware of Debtor's fraud by that date because he understood that Debtor would deceive an investor for his benefit.

### b.  Rene and Armande Baudez

Rene and Armande Baudez, Ms. Romani's parents, first began investing in Debtor in October 2000.  P-33 at 1.  Much like the Romanis, the Baudezes received promissory notes from Debtor with high interest rates of 40%-60%.  *See, e.g.*, P-36 at 19, 25.  Interest payments to the Baudezes were delayed at times, and on one occasion Debtor sent the Baudezes a significant overpayment, which the Baudezes sought to return.  PO-14 at 17.

Unlike the Romanis, the Baudezes did not speak English, and there is no evidence that they ever communicated directly with Debtor.  Ms. Romani testified that the Baudezes were not aware that a commission or finder's fee was paid on their investment.  Other than the fact that Mr. Baudez signed the checks from

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10

Debtor, the Romanis' testimony and Mr. Romani's emails indicate that Mr. Romani managed the Baudezes' investments with Debtor. *See* PO-14 at 16-17.

The Baudezes relied on the experience of their son-in-law, apparently due in part to their lack of understanding of the English language. Other than the high interest rates and occasional payment irregularities, the evidence shows that the Baudezes were not aware of most of the signs of Debtor's fraud. The Baudezes have met their burden of showing that they acted under the objective standard of good faith.

22.    The following summarizes the evidence of investments made by the Romanis and the payments that they received:

| | |
|---|---|
| Total Payments: | $779,647.32 |
| Total Investments: | $350,697.50 |
| MIMO: | $428,949.82 |

23.    At trial, Plaintiff conceded that two payments to the Baudezes that are reflected in its dashboard summary are not supported by adequate evidence. *See* P-33 at 6. The payments are for $2,833.33 and $19,875.00. P-33 at 6. The Court subtracted these payments from its findings. The following summarizes the evidence of investments made by the Baudezes and the payments that they received:

| | |
|---|---|
| Total Payments: | $820,744.71 |
| Total Investments: | $285,000.00 |
| MIMO: | $535,744.71 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11

24.     All transfers to Defendants were made with actual fraudulent intent and in furtherance of a Ponzi scheme.

25.     Defendants filed proofs of claim as follows:

- Horst and Claudine Romani – Claims No. 271-1; 322-1; 272-1; 273-1; 275-1; 276-1; 274-1; and

- Rene and Armande Baudez - Claim No. 316-1.

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(d).

2.     This Court has jurisdiction over Defendants.

3.     This action was timely commenced.

4.     The Court has statutory authority over this action.  In closing argument, Mr. Jackson argued on behalf of the Estate of the Baudezes that United States law should not apply to his clients' transactions.  Because the Estate did not permit Mr. Jackson to act on its behalf in preparation for trial, however, Mr. Jackson did not offer briefing or evidence that might have supported this argument.

Based on the available evidence, the Court concludes that United States law properly applies to the transfers to the Baudezes.  Although the Baudezes'

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12

promissory notes state that the notes will be governed by the laws of British Columbia, Canada, many of the notes were also notarized in the State of Washington, where Debtor had relocated its business. *See, e.g.*, P-31 at 12, 13, 14, 15, 16, 17. Moreover, Ms. Romani testified that Mr. Baudez endorsed the checks from Debtor, dozens of which are labeled with Debtor's Spokane address, P-34 at 100-359. For these reasons as well as those discussed in a related adversary proceeding, *see* 2:11-cv-00362-RMP, ECF No. 148, the Court concludes that it has statutory authority over this action.

5.     At least one unsecured creditor existed who triggered the strong arm power of 11 U.S.C. § 544(b)(1) because the creditor did not and should not reasonably have discovered the fraudulent nature of Debtor's Ponzi scheme transfers within one year before the bankruptcy petition was filed. *See* 2:11-cv-00362-RMP, ECF No. 197.

6.     Washington State law governing fraudulent transfers applies.

7.     Under the statutes relating to fraudulent transfers, 11 U.S.C. § 548 and RCW 19.40, *et seq.*, payments received from Debtor are recoverable from each Defendant by the Trustee, subject to the defense of good faith pursuant to 11 U.S.C. § 548(c) and RCW 19.40.081(a).

8.     Transfers made in furtherance of a Ponzi scheme constitute actual fraud under the Bankruptcy Code and Washington's version of the Uniform

Fraudulent Transfer Act (UFTA).  *See* Bankr. Adv. Doc. 11-80299, ECF No. 378 at 21-25.  "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers . . . ."  *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).

9.    A transferee of a fraudulent transfer may keep funds that it took for reasonably equivalent value and in good faith.  *See* 11 U.S.C. § 548(c); RCW 19.40.081(a).  As recipients of transfers that constitute actual fraud, the burden of proof in establishing the affirmative defense of good faith is on Defendants.  *In re Agric. Research and Tech. Grp., Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); 5 COLLIER ON BANKRUPTCY ¶ 548.09[2][c] at 548-98.2 (16th ed. 2011).

10.    Although "good faith" is not defined precisely in case law, at least one court has noted that the absence of good faith is shown by a transferee who knows that a debtor is operating a Ponzi scheme.  *See In re Agric. Research*, 916 F.2d at 535 (citing *In re Indep. Clearing House*, 77 B.R. 843, 861 (D. Utah 1987)).  The Ninth Circuit has quoted favorably an explanation in an early case that a transferee's "knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud

1    his creditors . . . should be deemed to have notice . . . as would invalidate the sale

2    as to him." *Id.* at 535 (quoting *Shauer v. Alterton*, 151 U.S. 607, 621 (1894)).

3        11.    Thus, courts measure good faith by an objective standard, looking to

4    what a transferee "'knew or should have known' in questions of good faith, rather

5    than examining what the transferee actually knew from a subjective standpoint."

6    *Id.* at 535-36.

7        12.    Under the Bankruptcy Code, Washington's UFTA, as well as relevant

8    case law, the Court does not contemplate a recipient's intent when deciding

9    whether to avoid fraudulent transfers.  5 COLLIER ON BANKRUPTCY ¶ 548.04[2] at

10   548-63; *Thompson v. Hanson*, 168 Wn.2d 738, 749 (2010).  Accordingly, a

11   transfer that constitutes actual fraud is avoided in its entirety unless the transferee

12   establishes that a reasonable person in the transferee's position would not and

13   should not have known of the fraud, not simply whether he or she *actually* acted in

14   good faith.

15       13.    Transfers made by Debtor in furtherance of its Ponzi scheme are

16   transfers made with actual intent to hinder, delay and/or defraud creditors under

17   both state law, RCW Ch. 19.40, and federal law, 11 U.S.C. § 548(a)(1).

18       14.    Defendants assert that they are entitled to retain the amount of

19   principal that they invested because they acted in good faith.

20

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 15

15.     The Trustee is entitled to pre-judgment interest at the applicable federal rate from July 21, 2009, when the bankruptcy case commenced.

16.     Defendants **Horst and Claudine Romani** met their burden of establishing that they accepted transfers from Debtor for value and in good faith only up to April 1, 2008.   The Romanis are entitled to retain **$350,697.50**, the amount of their investment in Debtor, from the sum of the transfers that they received from Debtor prior to April 1, 2008.

17.     Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **Horst and Claudine Romani** in the amount of **$428,949.82**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment until the date that the judgment is paid in full, *see* 28 U.S.C. § 1961.

18.     Defendants **Rene and Armande Baudez** met their burden of establishing that they accepted transfers from Debtor for value and in good faith. The Estate of the Baudezes is entitled to retain **$285,000.00**, the amount of their investment in Debtor, from the sum of the transfers that they received from Debtor.

19.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551 and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **Rene and Armande Baudez and their estate** in the amount of $**535,744.71**, plus pre-judgment interest from July 21, 2009, at the applicable federal judgment rate and post-judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

20.    The Trustee is entitled to reimbursement of its costs for pursuing this action.

21.    All proofs of claim filed by any of the Defendants in the Debtor's Bankruptcy proceedings or any claims that may hereafter arise are hereby disallowed pursuant to 11 U.S.C. § 502(d) unless and until the avoided transfers are returned to the Trustee.

22.    Trustee is awarded all applicable interest, costs and disbursements of this action against each Defendant.

The District Court Clerk is hereby directed to enter this Order and to provide copies to counsel.

**DATED** this 25th day of June 2014.

_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
Chief United States District Court Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 17